IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| **KELVIN A. CANADA,** | ) | |
| Plaintiff | ) | Civil Action No.: 7:11cv00569 |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| **WALTER DAVIS, et al.,** | ) | By: PAMELA MEADE SARGENT |
| Defendants. | ) | United States Magistrate Judge |

Plaintiff, Kelvin A. Canada, an inmate formerly incarcerated at Red Onion State Prison, ("ROSP") in Pound, Virginia, filed this action pro se for monetary damages under 42 U.S.C. § 1983. This case is before the undersigned magistrate judge on referral, pursuant to 28 U.S.C. § 636(b)(1)(B). Canada's only remaining claim was tried before the undersigned on December 6, 2012. Canada seeks an award of compensatory and punitive damages against Virginia Department of Corrections, ("VDOC"), Officer Walter Davis, Sgt. William Wright, Sgt. Paul Payne, and Capt. Dewayne Turner based on injuries Canada claims he received as a result of the officers' use of excessive force on September 3, 2011. Based on the evidence presented at trial, I find that the defendants did not use excessive force against Canada on September 3, 2011, and I recommend that the court enter judgment in favor of the defendants on Canada's § 1983 claim.

*I. Facts*

At trial, Canada testified that, on September 3, 2011, he was in a kneeling position being placed in ambulatory restraints at ROSP by defendants Wright,

Payne, and Davis under the supervision of Turner when Wright "jerked" his right arm forward to simulate an aggressive move. Canada testified that Payne, Wright and Davis then slammed him to the floor while Turner watched without intervening. Canada said that Davis gouged his left eye with his finger while falsely yelling for him to "stop trying to bite" him.  Canada also said that his right arm was pulled in an awkward position while the officers were on top of him lying on the floor. Canada testified that the right side of his face and head and his left eye were injured and that he suffered broken ribs and a separated right shoulder in the incident. Coleman said that his broken ribs were never treated and that he has undergone two surgeries to correct his separated shoulder.

Canada testified that he was being placed in ambulatory restraints because earlier that day he had thrown feces on a correctional officer. Canada stated that, prior to the incident, Turner had threatened him, telling him that he would pay for what he had done to the officer. Canada testified that he did not attempt to hit any of the officers while being placed in ambulatory restraints. Canada said that he was fully compliant with all of the officers' instructions and did not make any aggressive move to justify the use of force.  Canada testified that he did not resist efforts to place him in ambulatory restraints. Canada stated that he did not attempt to bite any of the officers while being restrained.  He further stated that it was impossible for him to bite any of the officers because he had a "spit mask" over his head at the time.

On cross-examination, Canada admitted that he had been in the shower and had thrown feces in the direction of a correctional officer prior to being placed in ambulatory restraints. Canada also admitted that officers had to use pepper or

"OC" spray on him to force him to comply with their orders to submit to be restrained to be removed from the showers.

Turner testified that he had ordered that Canada be placed in ambulatory restraints on September 3, 2011, as a result of his throwing feces and failing to comply with orders to submit to be restrained to be removed from the showers. Turner testified that Canada refused several orders to submit to be restrained to be removed from the showers. Turner authorized the use of OC spray on Canada, and Canada then submitted to be restrained before he was taken from the showers. Turner stated that restraints were placed on Canada's legs, and his hands were handcuffed behind him before being removed from the shower.

Turner testified that Canada was then taken to the B Building vestibule, where he was placed on his knees, his clothing was removed, and different restraints were applied to each ankle. Turner stated that Canada's hands were released from the handcuffs, and his arms were being moved to the front of his body to be restrained when the other officers took Canada to the floor.

Turner stated that, although he did not see Canada pull his arm forward in an attempt to hit Wright, he "knew" what had happened. Turner said that the most dangerous time while placing an inmate in ambulatory restraints occurs when the cuffs are released to move an inmate's arms from behind to in front to be restrained. Turner stated that during this time both arms are free to strike someone. Turner said that while the officers were on top of Canada on the floor, he heard them tell him to stop biting them. Turner testified that the spit mask on Canada would not have prevented him from biting someone. Turner testified that he saw

-3-

Case 7:11-cv-00569-SGW-PMS   Document 84   Filed 01/04/13   Page 3 of 13   Pageid#: 747

the officers struggle to gain control of Canada and that he, Turner, repeatedly told Canada to stop resisting. Turner also said he saw that a glove had been torn from one of the officer's hands during the struggle.

Turner testified that it was his responsibility to ensure that the officers used only that force necessary to control Canada. He also said that he did not witness any excessive use of force. Turner stated that the officers were simply trying to control or restrain Canada. Turner testified that he had witnessed numerous "takedowns" of inmates by officers at ROSP. Turner stated that, if an inmate was not resistant, he would be placed back in handcuffs and returned to a kneeling position.

William Wright testified that in September 2011 he worked for VDOC as a sergeant at ROSP. Wright stated that his role that day was to place the ambulatory restraints on Canada. To apply ambulatory restraints, according to Wright, an inmate kneels, and his clothing is removed. Next, the ambulatory restraint leg irons are applied, and the other leg irons are removed. Then, the handcuffs are removed, the inmate's hands are moved from behind to in front of his body, and the ambulatory restraint handcuffs are applied. Wright testified that, while he did not specifically recall what he did on that particular date, he usually removed the handcuffs from both wrists before attempting to move an inmate's arms to the front of his body.

Wright testified that, on September 3, when the officers attempted to move Canada's hands to the front to be restrained, Canada's arm came forward, and his fist struck the shield of the helmet he was wearing. The officers then took Canada

-4-

to the floor and tried to gain control of his arms to restrain them. Wright stated that Canada was resistant and would not give the officers his hands to be restrained. Wright testified that he saw no officers use excessive force and that they used only that amount of force necessary to regain control of Canada.

Wright stated that the use of a spit mask did not prevent an inmate from biting an officer. Wright admitted that he did not see Canada attempt to bite Davis, but he said he did hear Davis tell Canada to stop biting him. Wright also said that the officers did not have any plan or agreement to fake an assault by Canada to use force on him. Wright said that he never gouged, kicked or punched Canada while he was on the floor.

Officer Walter Davis testified that he was on Canada's right side to maintain control of Canada's right arm as he was placed in ambulatory restraints on September 3. Davis remembered that there was some substance on Canada's right arm that day making it slick. Davis stated that as he started to move Canada's right arm from behind his body to the front, Canada jerked his right arm away from Davis's control and hit Wright in the face shield. Davis stated that the officers immediately took Canada to the floor. Davis stated that Canada pulled his right hand under his body and that when Davis attempted to regain control of Canada's hand, Canada tried to bite him. Davis then attempted to restrain Canada's head so he could not bite him. Davis said that he repeatedly told Canada to stop trying to bite him.

VDOC Sgt. Paul Payne testified that, on September 3, when the officers attempted to place Canada in ambulatory restraints, he was on Canada's left side,

controlling his left arm. Payne stated that after Wright removed the cuffs from Canada's wrists, he took Canada's left hand and arm around to the front of his body, and the cuff was applied to his left wrist. When Davis started to move the right arm forward, Canada's arm came around and struck Wright in the face shield. Payne stated that the officers took Canada to the floor, and he continued to resist efforts to restrain him. Payne said that Canada grabbed his left hand and ripped the glove off of it.

Payne stated that the officers did not have any agreement to stage or fake Canada's assaultive behavior. He further testified that he would not do so because to do so would be dangerous to all of the officers involved. Payne stated that he did not gouge Canada in the left eye and did not see anyone else gouge him in the eye. Payne stated that he did not use any force other than that force necessary to regain control of Canada. Payne stated that, while he did not see Canada attempt to bite Davis, he did hear Davis tell Canada to stop biting him.

Davis testified that the officers did not have any plan or agreement to fake an assault by Canada to use force on him. Davis said that he did not gouge Canada in the eye. Davis said that he did not use any force other than that necessary to hold Canada's head still. Davis said that the force used by the officers was designed to regain control of Canada.

Canada also offered into evidence a video recording of the incident. The video recording shows that something occurred as the officers were attempting to move Canada's right arm from behind his body to the front of his body to be placed in ambulatory restraints. The officers then quickly forced Canada from his

-6-

Case 7:11-cv-00569-SGW-PMS   Document 84   Filed 01/04/13   Page 6 of 13   Pageid#: 750

kneeling position to the floor. After forcing Canada to the floor, the officers' bodies obstruct any view of Canada or their arms and hands for several minutes. During this time, the officers can be heard repeatedly instructing Canada to stop resisting and to stop trying to bite the officers.

The video does not definitively prove whether Canada brought his right arm forward or, as he claims, it was jerked or pushed forward by Davis. The video, however, does not show Davis shifting his weight or otherwise positioning himself to push or pull Canada's arm forward. Because the video is being recorded behind Canada, and Wright is in front of Canada, the video also does not reveal whether Canada punched or attempted to punch Wright in the face shield. The video does show Wright adjusting his helmet and face shield after Canada has been taken to the ground, as if something had knocked it out of the correct position.

After the incident, Canada appears to be bleeding on the right side of his head. The video also shows that, after the incident, Canada's left eye is visibly swollen. The video shows that, after the officers regained control of Canada, they placed him in ambulatory restraints, sat him in a wheelchair and took him to the medical department where two females, who appear to be nurses, examined Canada. They cleaned and placed what they said was antibiotic ointment on wounds on the right side of his head and over his left eye. One of the nurses informed Canada that she would place him on the list to be seen by a doctor and would request an x-ray. Canada requested something for pain, and one of the nurses said she would give him Motrin. The nurses then allowed the correctional officers to return Canada to his cell. Canada made no complaint of rib or shoulder pain to the nurses.

Vickie Phipps, the Director of Nursing at ROSP, testified that that ROSP medical records showed that Canada was treated in the medical department on September 3, 2011, for abrasions to his forehead and eye area, and an x-ray of his nose was ordered. According to Phipps, the x-ray of Canada's nose was normal. On September 5, 2011, an emergency grievance was filed claiming that Canada had a knot on his shoulder blade. Canada was sent out to a local hospital for x-rays to his shoulder, which Phipps said were normal. Phipps stated that Canada continued to complain of pain in his right shoulder, and a second set of x-rays of his right shoulder were taken on September 28, 2011. Phipps stated that these x-rays showed a third-degree AC joint separation. Phipps stated that this type of injury was not a degenerative condition and was usually caused by stretching the shoulder ligaments beyond the normal range of motion.

ROSP Nurse Trisha Cox testified that she observed a knot on Canada's right shoulder on September 5, 2011. Cox said that Canada complained of pain in his right shoulder and told her that his shoulder was injured in the September 3, 2011, incident. Cox said that Canada also complained of pain in his ribs and that his ribs made an unusual popping sound when he moved.

ROSP inmate Donnell J. Blount, Jr. also testified that he was involved in a similar takedown incident while being placed into ambulatory restraints by Davis and Wright on December 12, 2009. Blount testified that, in the 2009 incident, Davis jerked his arm forward, and the officers then took him to the floor claiming that he was resisting. Canada admitted a video recording of the 2009 incident involving Blount into evidence. The video recording clearly shows Blount

attempting to jerk his arm away from Davis's control, justifying the subsequent use of force to restrain him.

## *II. Analysis*

Canada alleges that correctional officers Wright, Payne and Davis used excessive force against him and that Turner allowed the assault to occur in violation of the Eighth Amendment's prohibition against the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII. This amendment not only prohibits excessive sentences, but it also protects inmates from inhumane treatment and conditions while imprisoned. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). The unnecessary and wanton infliction of pain by a prison official through the use of excessive force upon an inmate has been clearly established as a violation of the Eighth Amendment's prohibition on cruel and unusual punishment for a number of years. *See Hudson v. McMillian*, 503 U.S. 1, 5 (1992); *Whitley v. Albers*, 475 U.S. 312, 319 (1986). The Eighth Amendment also requires prison officials to take reasonable measures to guarantee the safety of inmates. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984).

The determination of whether the use of force by a prison official violates the Eighth Amendment includes both a subjective and objective component. *See Williams*, 77 F.3d at 761 (citing *Wilson v. Seiter*, 501 U.S. 294, 302 (1991)). Not every malevolent touch by a prison guard amounts to a deprivation of constitutional rights. *See Hudson*, 503 U.S. at 9 (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). To meet the objective component in an excessive force

-9-

case, an inmate must show that the force used was "nontrivial," *Wilkins v. Gaddy,* 130 S. Ct. 1175, 1179 (2010), given that "contemporary standards of decency always are violated … whether or not significant injury is evident." *Hudson,* 503 U.S. at 9. "This is not to say that the 'absence of serious injury' is irrelevant to the Eighth Amendment inquiry." *Wilkins,* 130 S. Ct. at 1178. In fact, the extent of the injury may suggest that "'the use of force could plausibly have been thought necessary' in a particular situation" or "provide some indication of the amount of force applied." *Wilkins,* 130 S. Ct. at 1178 (quoting *Hudson,* 503 U.S. at 7.) For example, "[a]n inmate who complains of a [mere] 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins,* 130 S. Ct. at 1178 (quoting *Johnson*, 481 F.2d at 1033.) As *Wilkins* clarified, it is the nature of the force "that ultimately counts" and provides the "core judicial inquiry" in an excessive force case. 130 S. Ct. at 1178, 1179. In particular, courts must consider "whether [the force] was nontrivial and 'was applied … maliciously and sadistically to cause harm.'" *Wilkins,* 130 S. Ct. at 1179 (quoting *Hudson*, 503 U.S. at 7.)[1]

To meet the subjective component in an excessive force case, the inmate must show that the prison official applied force "maliciously and sadistically for the very purpose of causing harm." *Whitley,* 475 U.S. at 320-21. The inquiry under the subjective standard is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."

---

[1] *Wilkins* abrogated the Fourth Circuit's decision in *Norman v. Taylor*, 25 F.3d 1259, 1263 (4th Cir. 1994) (en banc), which held that "absent the most extraordinary circumstances, a plaintiff cannot prevail on an Eighth Amendment excessive force claim if his injury is *de minimis*." The *Wilkins* Court held that "[t]he Fourth Circuit's strained reading of [*Hudson v. McMillian* was] not defensible" and that *Hudson* "did not, as the Fourth Circuit would have it, merely serve to lower the injury threshold for excessive force claims from 'significant' to 'non-de minimis' – whatever those ill-defined terms might mean." 130 S. Ct. at 1179.

*Hudson*, 503 U.S. at 7. The Supreme Court in *Whitley* set out several factors which should be considered in determining whether prison officials acted maliciously and sadistically. In particular, the court should consider:

1) the need for application of force;
2) the relationship between that need and the amount of force used;
3) the threat "reasonably perceived by the responsible officials;" and
4) "any efforts made to temper the severity of a forceful response."

*Williams*, 77 F.3d at 762 (citing *Whitley*, 475 U.S. at 321).

Regarding Canada's excessive force claim, I am persuaded by the evidence presented that the force used against Canada by Davis, Payne and Wright on September 3, 2011, was used in a good-faith effort to restore control of Canada and was not applied maliciously or sadistically to cause him harm. In particular, I find that, while being placed in ambulatory restraints, Canada pulled his right arm away from Davis's control and hit Wright in his face shield, thus, justifying the use of force by Davis, Payne and Wright to take Canada to the floor to restrain and regain control of him. I further find, in light of Canada's disruptive actions earlier in the day, that the force used by these defendants was only that amount they believed necessary to restrain and regain control of Canada. Therefore, I find that the defendants' use of force against Canada was not excessive and did not violate the Eighth Amendment's prohibition against cruel and unusual punishment. Based on my finding that excessive force was not used against Canada, I further find that Turner did not fail to protect Canada from the use of excessive force.

Based on these findings, I do not address the defendants' qualified immunity defense

# PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. While being placed in ambulatory restraints on September 3, 2011, at ROSP, Canada pulled his right arm away from Davis's control and hit Wright in his face shield;
2. As a result of Canada's action striking Wright, Davis, Payne and Wright took Canada to the floor in a good-faith effort to restore control of Canada;
3. Davis, Payne and Wright used only the amount of force they believed necessary to restrain and regain control of Canada;
4. The use of force against Canada by Davis, Payne and Wright was not applied maliciously and sadistically to cause harm to Canada;
5. The amount of force used against Canada by Davis, Payne and Wright was not excessive and did not violate the Eighth Amendment's prohibition against cruel and unusual punishment; and
6. Turner did not fail to protect Canada from an excessive use of force.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court grant judgment in the defendants' favor on Canada's claims based on use of excessive force and failure to protect.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Samuel G. Wilson, United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

DATED: This 4th day of January, 2013.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE